UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

SAM LOWE,

                Petitioner,                Case No. 1:09-cv-480

v.                                    Honorable Gordon J. Quist

MARY BERGHUIS,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Following a jury trial, Petitioner was convicted in the Berrien County Circuit Court of one count of first-degree criminal sexual conduct (CSC I), MICH. COMP. LAWS § 750.520b, and four counts of second-degree criminal sexual conduct (CSC II), MICH. COMP. LAWS § 750.520c.  On August 14, 2006, he was sentenced to a prison term of 9 to 27 years on the CSC I conviction and four terms of 3 to 15 years on the CSC II convictions.   In his *pro se* petition, Petitioner raises three grounds for relief, as follows:

    I.    WAS TRIAL COUNSEL CONSTITUTIONALLY INEFFECTIVE FOR NOT PROPERLY PREPARING FOR THE TRIAL BECAUSE HE NEVER VISITED THE SCENE OF THE CRIMES, NEVER VIEWED THE INITIAL AND ONLY INTERVIEW TAPE OF THE ALLEGED VICTIM, DID NOT INTERVIEW THE DEFENDANT'S OTHER CHILDREN WHO RESIDED IN THE HOME OF THE DEFENDANT AND CALL THEM AS WITNESSES AT THE TRIAL?

    II.    WAS TRIAL COUNSEL CONSTITUTIONALLY INEFFECTIVE FOR NOT AGGRESSIVELY DEFENDING HIS CLIENT?

III.   WHETHER THE COURT SHOULD REMAND THE CASE TO THE TRIAL COURT FOR AN EVIDENTIARY HEARING REGARDING DEFENDANT'S CLAIM THAT STATEMENTS HE ALLEGEDLY MADE TO TROOPER VRABLIC SHOULD HAVE BEEN SUPPRESSED FROM THE TRIAL BECAUSE THEY WERE MADE IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS NOT TO TESTIFY AGAINST HIMSELF?

(Pet., docket #1, Page ID##4, 6, 7.)

Respondent has filed an answer to the petition (docket #5) stating that the grounds should be denied because they are either procedurally defaulted or have no merit. Upon review and applying the AEDPA standards, I find that all grounds are without merit. Accordingly, I recommend that the petition be denied.

**Procedural History**

A.      **Trial Court Proceedings**

The state prosecution arose from Petitioner's sexual assaults of his trainably mentally impaired adoptive daughter, Stacey Lowe, when she was 15 or 16 years old. Petitioner initially was charged with three counts of CSC I and three counts of CSC II. A fourth count of CSC II was added following a four-day preliminary examination hearing held between March 7 and 14, 2006. Petitioner was bound over on all charges. Petitioner was tried before a jury beginning July 10, 2006, and concluding on July 17, 2006.

Prior to trial, a hearing was held on the prosecutor's motion to introduce other acts evidence under MICH. R. EVID. 404(b) and MICH. COMP. LAWS § 768.27(a), to which Petitioner had filed an objection. The evidence in issue was the testimony from the victim's older sister, Karla, who had accused Petitioner of sexual abuse a few years prior. The court permitted the introduction

of Karla's testimony.  (6/16/06 Hr'g Tr. at 26-27, docket #12.)  However, the court agreed to provide

a limiting instruction.  (*Id.* at 32.)

Physician Assistant Mary Anne Ramsey, testified that her gynecological examination

of Stacey revealed that Stacey did not have an intact hymen.  That finding, while consistent with past

sexual intercourse, was fully consistent with many other explanations. (Tr. I at 209-210.)  She found

no evidence of past trauma.  (*Id.* at 208.)

Pamela Harper testified that she was principal at the Blossomland Learning Center.

(Tr. II at 238.)  From 1999 through the time of the incidents underlying the prosecution, Stacey Lowe

was a student at Blossmland in an ungraded classroom for the cognitively impaired.  (*Id.* at 244.)

Harper learned of Stacey's allegations when Stacey was brought to the office by her homemaking

teacher.  (*Id.*)  After asking Stacey several questions, Harper referred Stacey to the school social

worker, Carla Flood, who made a referral to Protective Services.  (*Id.* at 245.)

Judy Greenwood, a Blossomwood school social worker, participated in psychological

testing of Stacey in January 2004, concluding that Stacey was trainably mentally impaired.  (*Id.* at

252.)  Stacey communicated at the level of a seven-year-old, but she was extremely social.  (*Id.* at

253-54.)  Stacey could not read or write, but she was good at home skills, such as cleaning, cooking,

and self-care.  (*Id.* at 255.)  On cross-examination, Greenwood testified that Stacey would believe

things that were not true, and she would make up things and start rumors to get attention.  (*Id.* at

258.)  It often was difficult to tell whether Stacey was lying or telling the truth.  (*Id.* at 259.)

According to Greenwood, the school taught about sexual abuse and what constituted good and bad

touching.  (*Id.* at 260.)  She also acknowledged that teachers and social workers were careful not to

place themselves in a situation in which they might be exposed to an allegation of sexual abuse

because children were capable of false allegations. (*Id.* at 261-62.) Stacey was capable of appreciating some consequences, but not typically long-term consequences. (*Id.* at 266.)

Michigan State Police Trooper Steve Vrablic testified that, after Stacey's allegations were reported, he and Heather Peterson from the Family Independence Agency went to Petitioner's residence and removed the other four children from the home. (*Id.* at 272.) Stacey was taken from the school and placed in foster care. (*Id.*) The next day, standing behind a one-way mirror, he observed Stacey's interview with Barb Welke of the Children's Assessment Center. (*Id.* at 273-74, 282.) The following day, Vrablic went to Petitioner's home and interviewed him on the porch. Vrablic advised Petitioner that he was not under arrest and was free to leave. (*Id.* at 275-76.) Vrablic explained Stacey's allegations and asked Petitioner if he had had sexual intercourse with Stacey. Petitioner denied the allegation. (*Id.* at 277.) Vrablic asked Petitioner about all of the allegations and whether Petitioner sexually touched Stacey, and Plaintiff again denied the allegations. (*Id.* at 278, 285, 288.) Petitioner claimed to have a good relationship with all of his children. According to Vrablic, Petitioner acknowledged that he may have accidentally touched Stacey's breasts and butt while they were roughhousing. (*Id.* at 278.) When Vrablic told Petitioner that Stacey had described his penis, Petitioner explained that Stacey had once come from the bathroom into his bedroom while he was changing his clothes, despite the standing rule that she was not to be there. He immediately ordered her out. (*Id.* at 279.) On cross-examination, Vrablic acknowledged inconsistencies between Stacey's story to Welke, in which she claimed that her father had put his finger in her vagina, and the story Stacey told at the preliminary examination, in which Stacey denied that her father put anything but his penis in her vagina. (*Id.* at 283-84.)

- 4 -

Trudy McManama was the school pychologist at the Berrien County Intermediate School District.   McManama was qualified as an expert in school pyschology.   (*Id.* at 303.) McMamara administered an intelligence test and other tests to Stacey in February 2004, when Stacey was almost 16.   (*Id.* at 304, 325.)   Stacey received a full scale intelligence score of 46.   (*Id.* at 317.) Stacey was functioning at a level of a person about half her age.   (*Id.*)   Stacey had difficulty remembering time frames for events.   (*Id.* at 327-28.)   McMamara acknowledged that Stacey would tell stories, not always appreciating whether they were true or whether they were part of something she had heard.   (Tr. III at 404-06.)

Heather Peterson testified that her duties as a Child Protective Services (CPS) Specialist included performing investigations of alleged sexual assaults of children.   (*Id.* at 408.) A child is interviewed using the forensic interviewing protocol to avoid suggesting language.   If the child makes any disclosure, the child is immediately referred to the Children's Assessment Center, where the child is interviewed by Barb Welke.   This is done so that the child only has to make one statement.   (*Id.* at 408-09.)   Peterson spoke with Stacey on February 14, 2006, the day after she received the call from the school.   Stacey made general allegations about sexual abuse.   (*Id.* at 411-12.)   She did not appear nervous and was confident.   (*Id.* at 417.)   Peterson and Trooper Vrablic went to Petitioner's home and took the rest of the six children into custody.   (*Id.* at 413.)   Petitioner and his wife were former foster parents for the county, during which time they adopted six children.   (*Id.* at 415.)   Defense counsel cross-examined Peterson on a variety of discrepancies in Stacey's versions of the events.   Peterson acknowledged that Stacey initially told her that she had only been sexually assaulted and that the assault did not involve penetration.   (*Id.* at 452.)   Stacey later stated during her interview with Barb Welke that she had been assaulted three times and had been penetrated on each

- 5 -

occasion. (*Id.* at 452.) She added a claim of digital penetration at the Welke interview, too. (*Id.* at 455.) Further, Stacey changed her story about whether she was clothed and the time of year in which the incidents occurred. (*Id.* at 456-57.)

Barb Welke, a forensic interviewer with the Children's Assessment Center, testified as an expert in forensic interviewing. (*Id.* at 472-74.) Welke interviewed Stacey using the forensic interviewing protocol. (*Id.* at 469.) A police officer, a prosecutor, and a CPS worker typically observe the interview through a mirror, and they can ask questions by way of an earpiece worn by the interviewer. (*Id.* at 469-71.) In this case, Trooper Vrablic, Prosecutor Ceresa, and CPS worker Heather Hoffman (Peterson) observed. (*Id.* at 474-75.) Stacey provided a narrative of events and acted out much of what she had experienced. (*Id.* at 478.) She became emotional toward the end of the interview. (*Id.* at 479.) Welke asked for chronology only in the form of what happened first, second and third, etc., because Stacey lacked the ability to be a good historian of specific time frames. (*Id.* at 483.) Stacey related three incidents: the first took place in her parents' bedroom; the second took place in the bathroom; and the third occurred during the summer and took place in Stacey's bedroom. (*Id.* at 485.) Defense counsel cross-examined Welke on additional distinctions between Stacey's interview with Welke and other evidence, including whether her father apologized and told her not to tell. (*Id.* at 488.)

The day before Stacey Lowe testified, defense counsel made an offer of proof regarding other accusations of sexual assault that Stacey had made. Four witnesses testified: Charlene Hyde, Amber Buford, Ludwiga Umbrasas, and Stacey Lowe.

Charlene Hyde testified that she was a foster care provider, and that Stacey had come to her home one day before Stacey's birthday in February. Stacey reported being molested by an

eleven-year-old foster child, Amber Buford, who stayed at Hyde's house for two days and one night

in mid-February 2006.  Stacey and Amber had bunk beds in the same room of the house.  (Tr. II at

338.)  Two days after Amber left the house, Stacey told Hyde that Amber had felt Stacey's bottom,

sucked her breasts, sucked her neck and kissed her.  (*Id.* at 339.)  Hyde called her license inspector

and reported the accusation.  (*Id.*)  Hyde asked Stacey why she did not report the incident to Hyde

when it happened.  Stacey said that Amber said that, if Stacey told, Amber would "get her."  (*Id.* at

340.)  Defense counsel elicited testimony that Stacey was nearly 18 years old when she arrived at

Hyde's home and was tall and weighed nearly 200 pounds.  Amber, in contrast, was tiny, weighing

only about 75 pounds.  (*Id.* at 338.)  Hyde testified that she did not believe Stacey because the story

was so unlikely and Stacey did not report it immediately.  (*Id.* at 341.)  In addition, Amber had spent

most of her time in Hyde's home crying, because she wanted to go home.  At night, Amber sat in the

hallway for most of the night, crying, and Hyde repeatedly checked on her during the course of the

night.  (*Id.* at 348.)

   Stacey made a second accusation on March 22 or 23, 2006.  Hyde brought her

daughter Alicia and Stacey with her to Target.  Stacey asked if she could go to the bathroom, and

Hyde said yes.  Stacey rejoined the others without any indication of a problem.  After they finished

shopping and were on their way home, Stacey told Hyde to call someone because a four-year-old

white girl had opened the door while Stacey was using the toilet and looked at Stacey.  (*Id.* at 341-

43.)  Stacey told Hyde to call the police or something.  Hyde again asked her why she did not say

something before.  Hyde called her caseworker and told her what Stacey said.  She also asked the

caseworker to find a new foster home because Stacey kept making accusations about being

approached in the wrong way, and Hyde was worried because she had two sons living in the home. (*Id.* at 342.)

Amber Buford testified as part of the offer of proof.  She stated that she was at Mrs. Hyde's for three days and two nights.  Nothing happened when she was at Mrs. Hyde's, except that Stacey told her some things.  Amber stated that she cried for the first night and did not talk to Stacey. (*Id.* at 366-67.)  According to Amber, she and Stacey were never in the same bed and never touched each other.  Amber had never heard Stacey's allegations before the day of her testimony.  (*Id.* at 368.)  She testified that she never asked Stacey to hug her or comfort her.  Instead, she went to her little brother, who was in a different room  (*Id.* at 369.)  Amber's little brother slept with her one night.  (*Id.* at 377.)  According to Amber, Stacey said that her old foster parent had molested her and gotten her pregnant.  Stacey also said that she was on birth control.  Stacey then told her that she and her old foster parent had sex.  (*Id.* at 370, 372.)  Later, Stacey told Amber that her foster parent had raped her.  Still later, Stacey began jumping up and down and said that her foster father had had sex with her and "[i]t was so, so fun." (*Id.* at 373.)  Amber stated that, after hearing these stories, she became confused and uncomfortable and started to cry and ask for her mother again.  (*Id.* at 373-74.) Amber testified that she did not believe Stacey because Stacey "was laughing and giggling like she wanted it to happen." (*Id.* at 375.)  Amber told Stacey that, if Stacey continued to tell her the stories, Amber would ask Mrs. Hyde if it happened.  (*Id.* at 375.)

Ludwiga Umbrasas testified that she was the mother of a Downs Syndrome daughter who went to school with Stacey.  Umbrasas frequently picked Stacey up to accompany her daughter on outings to go swimming or to a movie or restaurant.  (Tr. III at 497-98.)  She invited Stacey to Easter dinner.  Stacey's teacher was also there.  Over the dinner table, Stacey told a story about being

- 8 -

kissed and fondled by a young girl while she was at Hyde's house.  (*Id.* at 499.)  Umbrasas asked
Stacey whether she had told Hyde.  Stacey responded that she had told Hyde and that Hyde would
take care of it.  (*Id.* at 501-02.)

Stacey Lowe also testified on the offer of proof outside the presence of the jury about
her other allegations of sexual assault by other persons.  Stacey testified that Amber got into her bed
and began kissing her on the lips and neck.  Amber then got on top of her and started "humping" her
and rubbing her breasts.  (Tr. III at 508-09.)  Stacey denied that Amber had sucked her breasts.  (*Id.*
at 509-10.)  Stacey told Charlene Hyde sometime thereafter.  Stacey wanted Amber reported.  (*Id.*
at 510.)  She denied that Amber had made any threat to "get" her or any other threat.  (*Id.* at 510.)
She also denied telling anyone else about the incident.  (*Id.* at 512-13.)  She remembered having a
conversation at Umbrasas' house with her teacher present, but she denied telling them what Amber
did.  (*Id.* at 513.)

After the off-the-record testimony was completed, defense counsel argued that the
testimony should be presented to the jury as part of Petitioner's Sixth Amendment right to confront
witnesses.  (*Id.* at 516-26.)  The court agreed to rule on the issue before defense counsel cross-
examined Stacey Lowe.  (*Id.* at 527.)

When the jury returned to the courtroom, Stacey Lowe began her trial testimony.
Stacey was 18 years old at the time of her testimony.  She was 15 or 16 at the time Petitioner "did
bad things to [her]."  (*Id.* at 532.)  According to Stacey, the first incident occurred while she was
alone in the house with Petitioner.  Petitioner told her to come into her mom's bedroom.  He pulled
her pants and underwear down and laid her on the bed, with her legs up in the air.  He then pulled
her shirt up and began sucking her breasts.  Petitioner unzipped his pants, got on top of Stacey and

put his penis in her vagina.  (*Id.* at 533, 536-37.)  When he was done, "white stuff was coming out" of his penis.  (*Id.* at 533-34.)  Petitioner then allegedly wiped himself with a tissue and flushed it down the toilet.  (*Id.* at 535.)  Petitioner zipped his pants and they left the bedroom.  (*Id.*)

On the second occasion, Stacey was in the bathroom around the corner from the kitchen.  Petitioner lifted Stacey's bra and sucked her breasts.  (*Id.* at 538-39.)  Stacey testified that she was on the lid of the toilet seat with her legs in the air.  (*Id.* at 539-41.)  Petitioner had scooted her down and lifted her legs.  Petitioner then unzipped his pants and put his penis in her.  (*Id.* at 541.)  She saw the white stuff come out of his penis after Petitioner directed her to move her hand back and forth on his penis.  (*Id.* at 542-44.)  Petitioner again wiped himself with toilet paper and flushed it down.  (*Id.* at 544.)

The third time, Petitioner came to Stacey's room while she was watching television.  He laid her down on the floor and her pants and underwear were down.  He unzipped his pants and put his penis in her vagina.  He later put his finger in her vagina and moved the finger back and forth.  (*Id.* at 545-48.)  Finally, Petitioner sucked her breasts.  He then left the room and went downstairs.  (*Id.* at 547.)  After her mother got home, Stacey told her what had happened on the three occasions.  According to Stacey, her mother asked Petitioner if it was true.  Petitioner said he was sorry for what he had done and he would never do it again.  (*Id.* at 548-49.)  No further incidents occurred after that conversation.  Stacey testified that the last incident occurred before she returned to school in the fall.  (*Id.* at 550.)  When she returned to school, the girls in Miss Peterson's room discussed what they should do if somebody touched them.  They said to tell someone right away.  Stacey then went to the principal and talked to her.  The principal called the foster care people and Stacey went to stay with Charlene Hyde.  (*Id.* at 551.)

- 10 -

Following direct examination, the prosecutor argued that Stacey's other accusations of sexual molestation should not be presented to the jury. (*Id.* at 556-562.) The court issued a lengthy decision from the bench, excluding the evidence and denying defense counsel's motion to use the evidence to impeach Stacey Lowe. (*Id.* at 563-77.) Defense counsel then moved for reconsideration of the decision to admit testimony from Karla Lowe, who previously accused Petitioner of sexual assault. That motion was denied. (*Id.* at 579.)

Defense counsel then proceeded with a vigorous cross-examination of Stacey. Stacey was impeached with her preliminary examination testimony in which she denied that her father put anything but his penis in her. (*Id.* at 588.) Counsel also impeached Stacey with her statement to Heather Peterson disclosing only one incident. Stacey testified that Peterson got it wrong because Stacey had talked about all three incidents. (*Id.* at 589-90.) Defense counsel impeached Stacey with the virtual impossibility of Stacey's description of the assault in the bathroom, including showing her a picture of the bathroom. (593-96, 610-11.) Counsel also raised the implausibility of Stacey's claim that Petitioner never unbuttoned his pants on any occasion; he merely unzipped them and pulled his penis out through the zipper. (*Id.* at 599.) Defense counsel also impeached Stacey with the implausibility of her description of the third incident and with the discrepancies in her statements to others about the incident. (*Id.* at 593-96, 603.) In addition, counsel impeached Stacey with numerous other inconsistencies between her prior statements and preliminary examination testimony and her trial testimony. (*Id.* at 607-27.)

The final witness for the prosecution was Karla Lowe, Stacey's younger sister, who was 17 years old at the time of trial. Karla became Petitioner's foster child at the age of 7 and was adopted at the age of 9. (Tr. IV at 636.) For seven years, she lived with Petitioner, his wife, and her

siblings Stacey, Kelly, Quincy, Sage, April and Robert.  According to Karla, the touching began

when she was 10 in the kitchen of the home.  After a few encounters in the kitchen, Petitioner began

to come to the bedroom she shared with Stacey.  (*Id.* at 39-40, 642.)  Petitioner would fondle her

breasts through her clothes and touch her below the waist.  (*Id.* at 640.)  Petitioner approached Karla

from behind and pressed his body against hers, touching her with his hands.  (*Id.* at 640.)  The

touching occurred many times.  After the first couple of years, Petitioner was emboldened to touch

Karla when others were around but not looking.  (*Id.* at 640.)  In the bedroom, Petitioner would come

in after everyone was asleep and touch Karla on the breasts, butt and "private area."  (*Id.* at 648.)

At first, the touching was through her clothes, but when she was about 12 year old, Petitioner began

to lift up her gown and touch her breasts and private area.  (*Id.* at 648.)  Once, Petitioner got on top

of her, pushing her gown up and her underwear down, and attempted to have sex with her.  (*Id.* at

650.)  Karla screamed, "No," and turned to her side.  (*Id.* at 651-52.)  Karla only learned that

molestation was wrong when she watched an episode of "Oprah."  (*Id.* at 658.)  Karla stopped living

in the home on July 29, 2009, when she was 14 years old.  (*Id.* at 638-39, 642, 657.)  She tried to

commit suicide because she was depressed by what Petitioner was doing and by other things that

were going on in the house.  (*Id.* at 642-43.)  She told her aunt about the molestation, and her aunt

took her to the hospital.  (*Id.* at 642, 653.)  When her mother came to the hospital, Karla tried to tell

her about the molestation, but her mother wouldn't listen and Karla was afraid that her mother would

be mad.  (*Id.* at 653-54.)  Karla never returned home after that night.  (*Id.* at 654.)

On cross-examination, Karla acknowledged that, during the period of the alleged

molestation, she was having serious mental health problems, including having hallucinations and

hearing voices, and she was getting counseling and medication.  (*Id.* at 661.)  She acknowledged that,

during that time, she hurt another child on the bus.  Because of her illness, her parents were telling

her that they would send her to Pine Rest, where she did not want to go.  After leaving the home, she

ultimately was placed in an institution in Adrian, Michigan for a couple of years.  (*Id.* at 662, 680.)

Karla also acknowledged that, during the time she said she was molested in the bedroom, she slept

in the top bunk and Stacey slept in the bottom bunk.  (*Id.* at 664-65.)  Although her parents slept on

the first floor, three other rooms on the second floor were occupied by her siblings, including her

older brother Robert next door.  (*Id.* at 667.)  In addition, Quincy slept on the floor outside her room

and Kelly slept at the top of the stairs.  (*Id.* at 671.)  Karla testified that her father had threatened to

hit her once when she was talking back to her mother.  (*Id.* at 676-77.)

After Karla testified, the court issued a limiting instruction on the uses of Karla's

testimony.  The prosecution rested.  (*Id.* at 689-90.)  Out of the presence of the jury, defense counsel

placed an objection on the record to the court's limiting instruction, which changed and eliminated

multiple paragraphs of the defense's proposed instruction.  (*Id.* at 691-93.)

The defense presented the testimony of six witnesses, including Petitioner.  Professor

Barry Bates testified as an expert in biomechanics.  (*Id.* at 700.)  Based on the measurement of the

bathroom and toilet, the height of Stacey's pelvis on the toilet lid, the height of Petitioner's penis,

and the physical block caused by the raised legs, Bates testified that Stacey's description of the

physical assault in the bathroom was not physically possible.  (*Id.* at 703, 710-13.)  Similarly, based

on the geometry of Stacey's description of the assault, Bates gave his opinion that the alleged assault

on the floor of Stacy's bedroom was improbable.  (*Id.* at 716.)

Trooper Melissa Bernum testified that she investigated the complaints of sexual abuse

made by Karla Lowe in July 2003.  (*Id.* at 733.)  According to Bernum, Karla denied that Petitioner

had ever threatened her in any way.  (*Id.* at 734.)  In addition, Karla never told Bernum that Petitioner had gotten on top of her while she was lying down in a room upstairs or that Petitioner had become so bold as to touch her when others were around.  (*Id.* at 733.)  Bernum interviewed Stacey at the time, who told Bernum that she had never seen any conduct described by Karla.  (*Id.* at 737.)

Ludwiga Umbrasas testified that, in February 2006, she saw Stacey at school when she went to pick up her daughter.  Stacey told Umbrasas that her father had molested her.  Umbrasas testified that she asked Stacey whether it had happened more than one time.  Stacey denied that it had happened more than once.  (Tr. IV at 764-65.)

Lola Lowe, Petitioner's wife, testified that she and Petitioner had a rule in the house that Petitioner never went upstairs at night.  Lola always went up if something occurred.  She testified that she and Petitioner slept in the same bed, that she was a light sleeper, and that she would have known if Petitioner went upstairs at night.  According to Lola, Petitioner was 66 years old and had diabetes and high blood pressure.  (*Id.* at 745-46.)  Since he developed diabetes 15 years before, Petitioner had been unable to get an erection.  (*Id.* at 747.)  Stacey told Lola on one occasion that Petitioner had touched her, but she never claimed that he had intercourse with her or otherwise penetrated her.  (*Id.* at 748.)  According to Lola, Stacey had never been alone with Petitioner in the last three years.  (*Id.* at 748.)  They had a practice in their home that Petitioner took care of the boys and Lola took care of the girls.  The practice was based on advice from Child and Family Services to be careful about foster children, as they might lie about the foster parents because they wanted to go home.  (*Id.* at 749.)  Lola impeached a number of statements made by Karla.  (*Id.* at 750.)  Defense counsel introduced two photographs of the downstairs bathroom.  (*Id.* at 751-52.)

Finally, Petitioner testified in his own behalf, denying all allegations by Stacey and Karla.  (*Id.* at 770, 772, 774-76.)  He also testified that he had been unable to have an erection for about 15 years, as the result of his diabetes.  (*Id.* at 771.)  Petitioner also denied having told Officer Vrablic that he had touched Stacey while roughhousing.  (*Id.* at 785-86, 791-92.)

Following closing arguments and jury instructions, the jurors left to deliberate.  After about two hours, they asked to review the videotaped testimony of Stacey Lowe and Ludwiga Umbrasas.  They remained in the courtroom for nearly two hours watching the whole of that testimony.  Shortly thereafter, the jury was excused for the weekend and directed to return on Monday, July 17, 2006.  (Tr. V at 894-98.)  At the end of a full day of deliberations on July 17, 2006, the jury found Petitioner guilty of one of the three counts of CSC I and all four counts of CSC II.  (Tr. VI, 754.)  On August 14, 2006, Petitioner was sentenced to serve a term of nine to twenty-seven years on the CSC I conviction and three to fifteen years on each of the CSC II convictions.  (Sentencing Transcript, (S. Tr.) at 26, docket #19.)

## B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on July 2, 2007, raised the same three issues presented in this application for habeas corpus relief.  (*See* Def.-Appellant's Br. on Appeal, docket #20.)   Petitioner filed a motion to remand, which was denied by the Michigan Court of Appeals on June 19, 2007.  (*See* 6/19/07 Mich. Ct. App. Ord., docket #20.)  By unpublished opinion issued on January 17, 2008, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (*See* 1/17/08 Mich. Ct. App. Opinion (MCOA Op.), docket #20.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same three claims presented to and rejected by the Michigan Court of Appeals.  By order entered May 27, 2008, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* Mich. Ord., docket #21.)

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams v. Taylor*, 529 U.S. 362, 411 (2000); *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable."  *Id.* at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1);  *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001).  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

I.    Grounds I and II:  Ineffective Assistance of Trial Counsel

In both his first and second grounds for habeas relief, Petitioner contends that his trial attorney was constitutionally ineffective.  In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed

- 17 -

at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.  Moreover, as the Supreme Court recently has observed, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citing *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009)); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011).  In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

### A.      Failure to Investigate and Prepare

In Ground I of his habeas application, Petitioner argues that counsel failed adequately to investigate and prepare for trial by failing to visit the scene, failing to view the only interview tape of the alleged victim, and failing to interview the complainant's siblings or to call them as witnesses at trial.

It is well established that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  The duty to investigate derives from counsel's basic function, which is "'to make the adversarial testing process work in the particular case.'" *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (quoting *Strickland,* 466 U.S. at 690). This duty includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence. *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005).  "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy

measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. "The relevant question

is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v.*

*Flores-Ortega*, 528 U.S. 470, 481 (2000); *accord Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir.

2004). A purportedly strategic decision is not objectively reasonable "when the attorney has failed

to investigate his options and make a reasonable choice between them." *Horton v. Zant*, 941 F.2d

1449, 1462 (11th Cir.1991) (cited in *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000)); *see also*

*Wiggins v. Smith*, 539 U.S. 510, 527-28 (2003) (finding ineffective assistance where "counsel chose

to abandon their investigation [of mitigation evidence] at an unreasonable juncture, making a fully

informed decision with respect to sentence strategy impossible."). *Towns*, 395 F.3d at 258-59

(holding that defense counsel's failure to investigate potentially important witness in robbery and

felony murder trial was unreasonable, and thus constituted ineffective assistance, in violation of

Sixth Amendment); *Clinkscale*, 375 F.3d at 443 (collecting cases in which counsel's failure to

investigate a potentially important witness constituted ineffective assistance).

Applying the *Strickland* standard,[1] the Michigan Court of Appeals addressed the issue

as follows:

> Defendant first argues that he was denied the effective assistance of counsel.
> Ineffective assistance of counsel is ultimately a question of law, which we review de
> novo. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). Where, as
> here, no *Ginther*[1] hearing was held, review is limited to errors apparent on the record.
> *People v Knapp*, 244 Mich App 361, 385; 624 NW2d 227 (2001). To establish a
> claim of ineffective assistance of counsel, defendant must demonstrate: (1) that his
> counsel's performance fell below an objective standard of reasonableness under
> current professional norms; (2) that there is a reasonable probability that, but for
> counsel's error, the result of defendant's trial would have been different, and (3) the
> resulting trial was fundamentally unfair or unreliable. *People v Toma*, 462 Mich 281,

---

[1] Although the court of appeals cited only state cases, those cases themselves cited *Strickland* and applied the federal standard.

302; 613 NW2d 694 (2000); *People v Mack*, 265 Mich App 122, 129; 695 NW2d 342 (2005).  Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise.  *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004).

Defendant first argues that his trial counsel unreasonably failed to investigate whether his other children would have contradicted the victim's version of events.  A trial counsel's failure to reasonably investigate a case can constitute ineffective assistance of counsel.  *People v Grant*, 470 Mich 477, 493; 684 NW2d 686 (2004).  When claiming ineffective assistance due to defense counsel's unpreparedness, a defendant must show prejudice resulting from the lack of preparation.  *People v Caballero*, 184 Mich App 636, 640, 642; 459 NW2d 80 (1990).  Defendant specifically argues that the children would have undermined the testimony of the victim by asserting that the victim's presence in a certain bathroom where an assault allegedly occurred was inconsistent with a household rule.  Defendant also argues that the children would have exculpated defendant by contradicting the victim's version of events by testifying that the victim would not have been left alone with defendant.  We conclude that defendant has not met his burden of establishing the factual predicate for this claim.  *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

The record is devoid of any evidence that the children would have testified in support of defendant's defense, and defendant has failed to present affidavits or any other offer of proof supporting that this Court should remand for a *Ginther* hearing.  Moreover "the failure to call witnesses only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense."  *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004).  A substantial defense is a defense that could have made a difference at trial.  *People v Kelly*, 186 Mich App 524, 526; 465 NW2d 569 (1990).  As previously stated, nothing in the record supports that defendant's other children would have testified about the household rule or whether defendant would have been alone with the victim. Further, there is no reason to believe that such testimony would have affected the outcome of the trial.

Defendant also argues that he is entitled to a new trial because his trial counsel unreasonably failed to inspect the house where the alleged incidents occurred.  Defendant claims that a rudimentary inspection would have contradicted the victim's testimony about the assaults, and shown that her version of events was impossible.  We disagree.  Again, defendant has failed to establish the factual predicate of his claim.  *Hoag*, *supra* at 6.  The record does not support defendant's appellate assertions with respect to the location of the bathroom or whether it had a shower.  In addition, any alleged failure of defense counsel to investigate the house did not deprive defendant of a substantial defense.  The victim's credibility was attacked by defense counsel and inconsistencies were otherwise brought to the

attention of the jury.  "This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight."  *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999).

. . .

Defendant additionally argues that his trial counsel was ineffective for failing to obtain exculpatory discovery material, including a videotape of the victim's interview with the forensic interviewer.  Defendant fails to establish the factual predicate of this claim.  *Hoag, supra* at 6.   Defendant's trial counsel conducted a lengthy cross-examination of the forensic interviewer, including highlighting numerous discrepancies between the victim's trial testimony and her statements during the interview.  Thus, the record does not support that, but for counsel's conduct with respect to discovery, defendant would have been acquitted.  *Toma, supra* at 302.  In other words, there has been no showing that if other evidence, including the videotape, was obtained, the outcome of trial would have been different.

   [1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

(1/17/08 MCOA Op. at 1-3, docket #20.)

The state-court's determination was both legally and factually reasonable.  First, as the court of appeals found, Petitioner failed to provide any factual support for his claims of attorney error.  The court's factual findings on this point are entitled to a presumption of correctness.  28 U.S.C. § 2254(e)(1).

Petitioner argued on appeal, as in this habeas application, that his children were not interviewed by defense counsel, and, had they been interviewed, they would have provided confirmation of Petitioner's and his wife's testimony about the household rules, including whether Petitioner went upstairs at night or stayed alone with the girl children, and whether the children were allowed to be in the downstairs bathroom or the parents' bedroom.  He also claims that the other children could have provided supporting testimony about the layout of the house, further undermining the credibility of Stacey's description of events.  At no time, however, has Petitioner

provided evidence of what any of the other children would say.  He simply argues that such testimony might have been available.  Petitioner's argument falls far short of undermining the strong presumption that the state-court's factual conclusion was correct.

In addition, as the state court noted, the evidence was relevant only to potentially bolster the testimony of Petitioner and his wife on matters collateral to the central questions of Petitioner's guilt or Stacey's truthfulness.  The existence of household rules does not directly undermine Stacey's claim that she and Petitioner engaged in the described conduct; it only suggests that they may have had to break a rule to do so.  Counsel's decision not to present cumulative evidence on a secondary point already made by two witnesses is clearly one of strategy, which is entitled to a strong presumption of reasonableness – a presumption Petitioner makes no attempt to undermine.  *Strickland*, 466 U.S. at 690.  Moreover, even assuming counsel's performance fell below an objectively reasonable level, Petitioner can demonstrate no prejudice.  As the court of appeals discussed, there is no reason to believe that the testimony of Stacey's siblings on tangential matters would have affected the outcome at trial, especially given trial counsel's extensive attack on Stacey's credibility on these and other points.

With respect to Petitioner's claim that defense counsel failed to visit the home and thereby failed to be apprised of the improbability of Stacey's testimony about assaults, Petitioner again "has failed to establish the factual predicate of his claim."  (1/17/06 MCOA Op. at 2, docket #20.)  In fact, the record evidence suggests that defense counsel did visit the home.  Counsel used and later introduced two photographs of the bathroom to demonstrate the implausibility of Stacey's claim that she had been assaulted there.  (Tr. IV at 751-52.)  Counsel introduced expert testimony about the implausibility of the events as described, especially given the dimensions of the bathroom.

Further, defense counsel relentlessly challenged many elements of Stacey's story that defied probability based on the layout of the house, including the position of the bedrooms and baths and the impossibility of coming upstairs without someone hearing. All of these uses of the layout of the home suggest that counsel visited the home. The state-court's determinations on both the performance and prejudice prongs of *Strickland* were patently reasonable.

Petitioner's claim that defense counsel was ineffective for failing to obtain a copy of the videotape of Stacey's forensic interview is equally flawed. As noted by the court of appeals, Petitioner presents no evidence that counsel neglected to obtain the tape or transcript. Indeed, as the court observed, defense counsel "conducted a lengthy cross-examination of the forensic interviewer, including highlighting numerous discrepancies between the victim's trial testimony and her statements during the interview." (1/17/08 MCOA Op. at 3.) Defense counsel's extensive use of the inconsistencies between Stacey's other statements and her forensic interview strongly suggest that counsel viewed the videotape or transcript. As a result, Petitioner wholly fails to demonstrate that the state court's rejection of his claim was either factually or legally unreasonable.

### B.    Trial Decisions

In Ground II of his habeas application, Petitioner argues that counsel was ineffective in five other ways:  (1) by calling a witness who testified that the complainant told her that Petitioner had molested the complainant one time; (2) by telling the jury that the prosecutor had a duty to call the siblings as witnesses; (3) by failing to request the videotape or transcript of the complaint's interview at the Children's Assessment Center[2]; (4) by failing to inform Petitioner before trial that

---

[2]Petitioner's claim concerning the videotape and transcript of Stacey's interview at the Children's Assessment Center was also raised under his first habeas ground. The Court previously has addressed that claim under subheading A of this analysis, *supra*.

he was going to have to testify; and (5) by asking Petitioner during direct examination if he ever touched complainant's breast for sexual gratification.

Again, applying the *Strickland* standard, the Michigan Court of Appeals comprehensively addressed the arguments:

> Defendant next argues that it was objectively unreasonable for his trial counsel to introduce the testimony of a subsequent foster parent of the victim at trial, because that foster parent testified that the victim informed her of one of the encounters with defendant.  Decisions regarding what evidence to present are presumed to be matters of trial strategy. *Rockey*, supra at 76.  At trial, the prosecutor elicited that the victim informed numerous persons about her encounters with defendant, including the principal of her school, a Child Protective Services Specialist, and a forensic interviewer affiliated with Child Protective Services. Defendant's trial counsel attempted to show that the victim gave different versions of her story to each person she informed of the encounters.  During his opening statement, defendant's trial counsel asserted that the victim "has told different stories at different times."  The testimony of the subsequent foster parent was consistent with this strategy.  She testified that the victim only mentioned one sexual encounter with defendant; this contradicted the victim's testimony at trial.  "This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight." *Id.* at 76-77.  The fact that defense counsel's strategy may not have worked does not constitute ineffective assistance of counsel. *People v Stewart (On Remand)*, 219 Mich App 38, 42; 555 NW2d 715 (1996).  Moreover, defendant cannot show that the challenged testimony was outcome determinative.  The jury heard testimony from numerous other witnesses that the victim disclosed abuse.  To be entitled to relief on the ground that counsel was ineffective, defendant must demonstrate that, but for trial counsel's decision to admit the evidence, he would have been acquitted.  See *Toma*, *supra* at 302.

> Defendant next argues that his trial counsel unreasonably informed the jury that the prosecutor had a duty to call the victim's siblings as witnesses.  Regardless whether counsel's statements were incorrect, defendant does not meet his burden to explain or rationalize how defense counsel's conduct in making the challenged assertions fell below an objective standard of reasonableness, but for which the outcome of the trial would have been different. *Toma*, *supra* at 302.  Defendant also argues on appeal that his trial counsel failed to "inform him of the nature of the court proceedings or that he was going to put him on the stand."  Again, defendant does not explain or rationalize his position that this alleged lack of information regarding the nature of the court proceedings prejudiced him.  Defendant may not merely state a

position and then leave it to this Court to discover and rationalize the basis for the claim. *People v Mackle*, 241 Mich App 583, 604 n 4; 617 NW2d 339 (2000). Defendant's claims therefore fail.

. . .

Next, defendant argues that his trial counsel unreasonably implied that Trooper Vrablic's testimony was correct during the direct-examination of defendant. Defendant fails to show how the challenged testimony was either prejudicial to him or deprived him of a substantial defense. To the contrary, the cited exchange refuted the victim's assertions regarding her alleged sexual encounters with defendant. Furthermore, during direct examination, defendant refuted Trooper Vrablic's testimony. Trial counsel's decisions regarding the presentation of testimony will be deemed ineffective only where a defendant can show that he was deprived of a substantial defense. *Dixon*, *supra* at 398.

(1/17/08 MCOA Op. at 2-3, docket #20.)

The state-court's determinations of all of the alleged errors by counsel constitute reasonable applications of established Supreme Court precedent. First, counsel's decision to call Ludwiga Umbrasas unquestionably was part of counsel's overall strategy of undermining Stacey's credibility by showing how many different stories she told at different times. That strategy was patently reasonable. Moreover, as the state court pointed out, Umbrasas' testimony could not have been prejudicial in light of the numerous other witnesses' testimony regarding Stacey's statements alleging abuse.

Second, defense counsel's argument that the prosecutor had an obligation to call the other children as witnesses was neither objectively unreasonable performance nor prejudicial. Regardless of whether the statement was true under Michigan law, the argument was strategically designed to highlight the prosecution's total reliance on Stacey's statements. Further, since the argument did not elicit an objection, the jury would have no reason to draw an inference against

Petitioner.  As a consequence, the state-court reasonably determined, Petitioner fails to meet his burden of demonstrating a violation of either prong of the *Strickland* standard.

Third, Petitioner conclusorily claims that, prior to the day of trial, counsel never fully informed his client of the nature of the court proceedings or that he intended to put Petitioner on the stand.  The state court declined to address this claim on the merits, concluding that Petitioner failed to flesh out his claim, in violation of a state procedural requirement barring appellants from making conclusory claims without factual or legal support.  (1/17/08 MCOA Op. at 3, docket #20 (citing *People v. Mackle*, 617 N.W.2d 339, 350 n.4 (Mich. Ct. App. 2000)).)

Petitioner's claim therefore appears to be procedurally defaulted.  When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

If a petitioner procedurally defaulted his federal claim in state court, in order to obtain habeas relief, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim,

- 26 -

or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Petitioner unquestionably failed to comply with the regularly enforced and independent state procedural requirement that "'[a] party may not leave it to [the appellate court] to search for authority to sustain or reject its position.'" *Mackle*, 617 N.W.2d at 350 n.4 (quoting *In re Keifer*, 406 N.W.2d 217, 219 (Mich. Ct. App. 1987)). A failure to address the merits of an argument constitutes abandonment of the issue. *See, e.g., People v. Grisham*, No. 276414, 2008 WL 4605913, at *4 (Mich. Ct. App. Oct. 9, 2008) (citing *People v. Harris*, 680 N.W.2d 17, 21 (Mich. Ct. App. 2004)). Petitioner's appellate claim was limited to a single conclusory sentence. In addition, the court of appeals squarely enforced the rule. As a consequence, Petitioner's claim is procedurally defaulted. Moreover, Petitioner has made no attempt to show cause and prejudice excusing his default or to show actual innocence based on new reliable evidence. As a consequence, his claim regarding counsel's failure to inform him that counsel intended to call him as a witness is procedurally defaulted. *House*, 547 U.S. at 536.

Further, even if the claim were not procedurally defaulted, it is meritless. Petitioner provided neither the state court nor this Court with any evidence supporting his conclusory statement

about counsel's delay in informing Petitioner about the trial strategy.  Further, Petitioner does not even argue that, but for counsel's delay in telling Petitioner that he intended to call Petitioner as a witness, Petitioner would have chosen not to testify.  As a consequence, he has failed to demonstrate ineffective assistance of counsel because he has not shown that he was prejudiced by counsel's delay in informing him about the trial strategy.

As his final claim of ineffective assistance of counsel, Petitioner contends that defense counsel was ineffective during his direct examination of Petitioner by asking him whether he had touched Stacey's breasts for sexual gratification.  Petitioner argued in the state court and in his habeas petition that the question implied that counsel believed Trooper Vrablic's testimony that Petitioner had admitted touching Stacey's breasts inadvertently.  As the state court observed, the argument is factually unsupported.  On direct examination, Petitioner was asked numerous questions, in response to which Petitioner denied all allegations made by Stacey.  (Tr. IV at 770-71.)  In addition, during the course of his testimony, Petitioner expressly denied making the statements Trooper Vrablic claimed. (Tr. IV at 785-88, 791-92.)  The state court concluded that the challenged question was not prejudicial and did not deprive Petitioner of a substantial defense.  That is based on an entirely reasonable assessment of the facts.  The state-court's analysis was a reasonable application of the *Strickland* standard.

II.      Ground III:  Motion to Suppress

In his third ground for habeas relief, Petitioner contends that the trial court should have suppressed his statements to Trooper Vrablic because he was not given the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966).  In *Miranda*, the Supreme Court held that, in order to protect an individual's Fifth Amendment privilege against self incrimination, when an individual is

in custody, law enforcement officials must warn the suspect before his interrogation begins of his right to remain silent, that any statement may be used against him, and that he has the right to retained or appointed counsel. *Id.* at 478-79; *see also Dickerson v. United States*, 530 U.S. 428, 435 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994). The test for determining whether an individual is "in custody" for purposes of *Miranda* is objective: whether a reasonable person in the defendant's position, knowing the facts as the defendant knew them, would have felt that he was under arrest or was "otherwise deprived of his freedom in any significant way." *Miranda*, 384 at 477. The determination does not turn on the subjective views of either the interrogating officer or the person being questioned. *Stansbury*, 511 U.S. at 323; *Mason v. Mitchell*, 320 F.3d 604, 631 (6th Cir. 2003).

In his petition and in his state-court appeals, Petitioner contended that Vrablic had admitted that he was dispatched to arrest Petitioner. Petitioner therefore contends that he was entitled to *Miranda* warnings before being questioned by Vrablic.

The Michigan Court of Appeals rejected Petitioner's argument as follows:

On the record before us, suppression was not warranted. *Miranda* warnings are not required unless the accused is subject to a custodial interrogation. *People v Zahn*, 234 Mich App 438, 449; 594 NW2d 120 (1999). "An officer's obligation to give *Miranda* warnings to a person attaches only when the person is in custody, meaning that the person has been formally arrested or subjected to a restraint on freedom of movement of the degree associated with a formal arrest." *People v Peerenboom*, 224 Mich App 195, 197; 568 NW2d 153 (1997). To determine whether a defendant was in custody at the time of an interrogation, this court takes into account the totality of the circumstances, with the key question being whether the accused reasonably could have believed that he was not free to leave. *People v Mendez*, 225 Mich App 381, 382383; 571 NW2d 528 (1997). The determination of custody depends on the objective circumstances of the interrogation rather than the subjective views harbored by either the interrogating officers or the person being questioned. *Zahn*, *supra* at 449.

The record shows that defendant's statement to Trooper Vrablic was not made during a custodial interrogation. The interview occurred in a "screened in porch that was attached to the front of [defendant's] residence." Police questioning in a suspect's home is usually viewed as noncustodial, because the psychological pressures associated with the atmosphere of the station house are not present. *People v Coomer*, 245 Mich App 206, 220; 627 NW2d 612 (2001). Here, Trooper Vrablic testified that, when he arrived at defendant's house, he stated that defendant was not under arrest and that defendant was free to leave. On this record, the trial court did not commit plain error by admitting defendant's statements to Trooper Vrablic, trial counsel was not ineffective in failing to challenge the admission of the statement, and defendant has not shown the presence of a factual dispute that would require an evidentiary hearing.

(1/17/08 MCOA Op. at 4.)

The state court, while referencing only state cases, clearly applied the applicable federal standard for determining whether a suspect was in custody. Petitioner's argument that the interrogation was custodial because Trooper Vrablic intended to arrest Petitioner before he began questioning is legally frivolous. As previously discussed, both the officer's and the suspect's subjective opinions are irrelevant to the determination of whether Petitioner was in custody. *See Stansbury*, 511 U.S. at 323. As a result, Vrablic's subjective intent to eventually place Petitioner under arrest has no bearing on the "in custody" inquiry.[3]

The Sixth Circuit has identified several factors to be considered when determining whether an interrogation was custodial: (1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he did not need to answer questions. *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010) (citing *United States v. Panek*, 552 F.3d 462, 465 (6th

---

[3]In addition, as a factual matter, Vrablic did not testify at trial that he was dispatched to arrest Petitioner. Instead, he testified that, after observing the forensic interview of Stacey Lowe, he conducted follow-up investigations. The day after Stacey's interview, Vrablic went to Petitioner's home with the purpose only of interviewing Petitioner. (Tr. II at 274-75.)

Cir. 2009)).  As the state court found, Petitioner fails to point to the existence of a factual dispute regarding whether Petitioner was in custody.  Vrablic questioned Petitioner while they were on the screened-in porch of Petitioner's own home, a location that typically does not present a coercive environment.  *See Hinojosa*, 606 F.3d at 883.  Vrablic testified that he told Petitioner that he was not under arrest and that he was free to leave.  During the course of Petitioner's testimony, Petitioner admitted that he was not in custody, saying that Vrablic stated that "they told him to arrest me, but he said he wasn't going to arrest me.  And he sat and listened on the front porch."  (Tr. IV at 792.) Petitioner also acknowledged that he had had no problem with Vrablic during the investigation.  (*Id.* at 786-87.)  Petitioner has identified no factual circumstance that would suggest that the interrogation was in any way coercive.

In sum, none of the factors for determining whether an interrogation was custodial suggest that Petitioner was in custody at the time of Vrablic's interrogation.  As a consequence, the state-court's disposition of his claim constituted a reasonable application of established Supreme Court precedent.

## **Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Date:  November 21, 2011                          /s/ Ellen S. Carmody
                                                                ELLEN S. CARMODY
                                                                United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).